UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

RECO SIMMONS,

                    Plaintiff,                          Case No. 1:23-cv-52

v.                                                      Honorable Jane M. Beckering

ANDREW BOUDREA et al.,

                    Defendants.

_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff

has been granted leave to proceed *in forma pauperis*. (ECF No. 6.) In an order (ECF No. 9) entered

on February 7, 2023, the Magistrate Judge directed Plaintiff to submit an amended complaint

within 28 days. The Court received Plaintiff's amended complaint (ECF No. 10) on March 8, 2023.

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996)

(PLRA), the Court is required to dismiss any prisoner action brought under federal law if the

complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks

monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42

U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* amended complaint indulgently, *see*

*Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they

are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying

these standards, the Court will dismiss Plaintiff's amended complaint for failure to state a claim.

## Discussion

### I.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan. The events about which he complains occurred at that facility and the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. Plaintiff sues MBP Nurse Practitioner Andrew Boudrea and Psychologist Amy Robare, as well as the following personnel at ICF: Unit Chief and Psychologist D. Maranka, Doctor Hanna Saad, Psychologists MacKenzie Sullivan and Andrew Eastham, and Nurse Practitioner Tracy Schafer. Plaintiff indicates he is suing all Defendants in their official and personal capacities. (ECF No. 10, PageID.61–63.)

Plaintiff alleges that on October 6, 2020, Defendant Boudrea diagnosed him with schizoaffective disorder, depressive type. (ECF No. 10, PageID.64.) According to Plaintiff, his diagnosis qualifies as a major mental disorder (MMD). (*Id.*) Three months later, on January 5, 2021, Defendant Boudrea changed Plaintiff's diagnosis "without any explanation or reason documented in Plaintiff's mental health records." (*Id.*) Plaintiff claims the "deterioration of [his] mental health status, along with improper medications[,] caused Plaintiff to act irrationally and resulting in assaulting the staff." (*Id.*)

On March 12, 2021, Plaintiff was transferred to ICF after he assaulted a staff member at MBP. (*Id.*) Plaintiff contends that in a completed misconduct sanction assessment form, Defendant Robare wrote, "Prisoner Simmons has a disorder of mental illness and prolonged L.O.P. (loss of [privileges]) may cause a deterioration in mental status." (*Id.*) Plaintiff claims that she "failed to advise" qualified mental health personnel. (*Id.*) Thirteen days later, on March 25, 2021, Defendant Sullivan documented that Plaintiff was mentally ill and required special management in

segregation. (*Id.*) Plaintiff claims, however, that Defendant Sullivan "likewise failed to advise" qualified mental health personnel. (*Id.*)

On April 2, 2021, Defendant Saad diagnosed Plaintiff with schizoaffective disorder, depressive type. (*Id.*, PageID.65.) Plaintiff claims, however, that Defendant Saad "commented that he did not see or evaluate Plaintiff." (*Id.*) On April 22, 2021, Defendant Schafer "discontinued and renewed Plaintiff's medication." (*Id.*) Plaintiff alleges further that Defendant Schafer was involved in the decision to remove Plaintiff from the START Program waiting list. (*Id.*) According to Plaintiff, the START Program "is a step down transitional unit for inmates where the behavior of inmates is observed and [privileges] are reintroduced slowly over time, until inmates can be reintegrated back into general population." (*Id.*) Plaintiff claims that Defendant Schafer's actions caused him to "suffer and deteriorate, which led to severe persistent suicidal ideology, along with the lack of capability to understand and appreciate reality." (*Id.*)

Plaintiff alleges that he was placed on the START Program waiting list "seven (7) months into his segregation stay." (*Id.*) On October 4, 2021, Defendant Eastham removed Plaintiff from the waiting list "because the 'program' would not meet the criteria to understand Plaintiff." (*Id.*) Plaintiff contends this decision "resulted in Plaintiff's further subjection to segregation (without disciplinary reasons) and further deterioration of his mental health status." (*Id.*)

Plaintiff alleges he was released from segregation in May of 2022. (*Id.*, PageID.64.) He claims that he was "so mentally unstable[] that he immediately got into a fight because of the voices in his head urging him to do so." (*Id.*) Plaintiff's paranoia was exacerbated by "the isolation forced on him mentally over such a long period of time." (*Id.*) Plaintiff claims that he was "paneled" by Defendant Saad on July 7, 2022, "after missing a few doses of his medication." (*Id.*, PageID.64–65.) "Mental health staff forced Plaintiff to take his medication." (*Id.*, PageID.65.)

3

Plaintiff alleges further that Defendant Maranka was "the person who signed off on 'programming' and a part of the . . . team that's a part of Plaintiff's treatment plan, and a part of [the] Security Classification Committee (SCC)." (*Id.*) According to Plaintiff, Defendant Maranka completed a misconduct sanction assessment form on November 3, 2022, stating "long term segregation may lead to increase in mental health sym[p]toms" in Plaintiff." (*Id.*)

Plaintiff claims that "he felt like [he] was being tortured and had no choice in his medical/mental care." (*Id.*) Plaintiff alleges that Defendants denied him "reasonably necessary mental health care" and subjected him to cruel and unusual punishment. (*Id.*) Based on the foregoing, the Court construes Plaintiff's complaint to assert Eighth and Fourteenth Amendment claims against all Defendants. Plaintiff seeks damages as well as unspecified injunctive relief. (*Id.*, PageID.66.)

## II.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).

4

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Official Capacity Claims

As noted above, Plaintiff sues Defendants in both their official and personal capacities. (ECF No. 10, PageID.61–63.) Although an action against a defendant in his or her individual capacity intends to impose liability on the specified individual, an action against the same defendant in his or her official capacity intends to impose liability only on the entity that they represent. *See Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). A suit against an individual in his official capacity is equivalent to a suit brought against the governmental entity: in this case, the MDOC. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). The states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984);

5

*Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous opinions, the United States Court of Appeals for the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment. *See, e.g.*, *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013); *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010).

Plaintiff seeks damages as well as unspecified injunctive relief. (ECF No. 10, PageID.66.) Official capacity defendants, however, are absolutely immune from monetary damages. *See Will*, 491 U.S. at 71; *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1998). The Court, therefore, will dismiss Plaintiff's damages claims against Defendants in their official capacities.

Although damages claims against official capacity defendants are properly dismissed, an official capacity action seeking injunctive relief constitutes an exception to sovereign immunity. *See Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (holding that the Eleventh Amendment immunity does not bar prospective injunctive relief against a state official). The United States Supreme Court has determined that a suit under *Ex Parte Young* for prospective injunctive relief should not be treated as an action against the state. *Graham*, 473 U.S. at 167 n.14. Instead, the doctrine is a fiction recognizing that unconstitutional acts cannot have been authorized by the state and therefore cannot be considered done under the state's authority. *Id.*

Importantly, "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as

prospective.'" *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). Plaintiff, however, is no longer confined at MBP, where he avers that Defendants Boudrea and Robare are employed. The Sixth Circuit has held that transfer to another prison facility moots a prisoner's claims for declaratory and injunctive relief. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996). Where, as here, the inmate has been transferred away from certain defendants, it can no longer be said that the violation is "ongoing" or that any relief is "prospective" as applied to Plaintiff. The Court, therefore, will dismiss Plaintiff's official capacity claims for injunctive relief against Defendants Boudrea and Robare.

Plaintiff is still confined at ICF, where he avers Defendants Sullivan, Maranka, Saad, Eastham, and Schafer are employed. Injunctive relief, however, is appropriate only where the plaintiff can show a reasonable expectation or demonstrated probability that he is in immediate danger of sustaining direct future injury as the *result* of the challenged official conduct. *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Past exposure to an isolated incident of illegal conduct does not, by itself, sufficiently prove that the plaintiff will be subjected to the illegal conduct again. *See, e.g.*, *id.*; *Alvarez v. City of Chicago*, 649 F. Supp. 43 (N.D. Ill. 1986); *Bruscino v. Carlson*, 654 F. Supp. 609, 614, 618 (S.D. Ill. 1987), *aff'd*, 854 F.2d 162 (7th Cir. 1988); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). In this action, Plaintiff, has not alleged an ongoing violation of federal law against Defendants Sullivan, Maranka, Saad, Eastham, and Schafer. Plaintiff's official capacity claims for injunctive relief against those individuals, therefore, will also be dismissed.[1]

In sum, the Court will dismiss Plaintiff's official capacity claims against all Defendants. The Court considers Plaintiff's personal capacity claims below.

---

[1] To the extent Plaintiff seeks injunctive relief against any Defendants in their personal capacities, such claims will also be dismissed for the reasons set forth above.

**B.       Personal Capacity Eighth Amendment Claims**

Plaintiff contends that Defendants violated his Eighth Amendment rights by failing to provide "reasonably necessary mental health care" and by "subject[ing him] to delib[e]rate indifference and cruel and unusual punishment." (ECF No. 10, PageID.65.)

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Plaintiff's allegations implicate two distinct Eighth Amendment claims: a claim based on long-term placement in segregation, and a claim based on Plaintiff's allegations that Defendants have not provided adequate mental health treatment. The Court considers each claim below.

**1.       Placement in Segregation**

In the MDOC, security classifications, from least to most secure, are as follows: Levels I, II, IV, V, and administrative segregation. MDOC Policy Directive 05.01.130 ¶ B (eff. Oct. 10, 2011). There are three types of segregation: temporary segregation, administrative segregation, and punitive segregation. MDOC Policy Directive 04.05.120 ¶¶ M, Q, Z (eff. June 1, 2019).

Administrative segregation is the most restrictive and is imposed for institutional security, *e.g.*, when a prisoner poses a serious escape risk. *Id.* ¶ Q. Detention, or "punitive segregation," can be imposed as a sanction for committing a major misconduct, if ordered by the hearing officer. *Id.* ¶ Z. If possible, detention is served in a designated detention cell rather than in a cell designated for administrative segregation. *Id.* A prisoner may not remain in detention for a period longer than that ordered by the hearing officer, *id.*, but a prisoner classified to administrative segregation remains in that classification until he is reclassified, *id.* ¶ I. The "behavioral adjustment" of a prisoner in segregation is reviewed periodically by the SCC. *Id.* ¶ FFF. Reclassification from administrative segregation occurs only with the approval of the SCC and the Warden (or designee). *Id.* ¶ KKK.

The Eighth Amendment prohibits any punishment which violates the civilized standards of humanity and decency or involves the unnecessary and wanton infliction of pain. *See Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). As discussed above, to state an Eighth Amendment claim, an inmate must show that he has been deprived of the minimum civilized measures of life's necessities. *See Rhodes*, 452 U.S. at 347. Because placement in segregation is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is typically insufficient to support an Eighth Amendment claim. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation. *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008); *see also Lacey v. Michigan Dep't of Corr.*, No. 95-1097, 1995 WL 564301 (6th Cir. Sept. 21, 1995) (concluding that placement in detention did not violate the Eighth Amendment); *Eaddy v. Foltz*, No. 85-1419, 1985 WL 14065 (6th Cir. Dec. 18,

1985) (discussing that whether an Eighth Amendment claim is stated for placement in segregation depends upon severity or pervasiveness of conditions).

Nonetheless, the Supreme Court has recently focused attention toward the consequences of long-term isolation in segregation:

> The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators. Eighteenth-century British prison reformer John Howard wrote "that criminals who had affected an air of boldness during their trial, and appeared quite unconcerned at the pronouncing sentence upon them, were struck with horror, and shed tears when brought to these darksome solitary abodes." The State of the Prisons in England and Wales 152 (1777). In literature, Charles Dickens recounted the toil of Dr. Manette, whose 18 years of isolation in One Hundred and Five, North Tower, caused him, even years after his release, to lapse in and out of a mindless state with almost no awareness or appreciation for time or his surroundings. A Tale of Two Cities (1859). And even Manette, while imprisoned, had a work bench and tools to make shoes, a type of diversion no doubt denied many of today's inmates.
>
> One hundred and twenty-five years ago, this Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and peculiar mark of infamy." *In re Medley*, 134 U.S. 160, 170, 10 S. Ct. 384, 33 L. Ed. 835 (1890); see also *id.*, at 168, 10 S. Ct. 384 ("A considerable number of the prisoners fell, after even a short [solitary] confinement, into a semi-fatuous condition . . . and others became violently insane; others, still, committed suicide").

*Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring); *see also Glossip v. Gross,* 576 U.S. 863, 925–26 (2015) (Breyer, J., dissenting) (noting the "dehumanizing conditions of confinement" and that "prolonged solitary confinement produces numerous deleterious harms").

Indeed, several studies have shown that long-term isolation has deleterious psychological effects. "There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017) (quoting Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997)). "[E]ven a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal

pattern characteristic of stupor and delirium." *Id.* at 567 (quoting Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 331 (2006)). Solitary confinement frequently causes "[a]nxiety . . . [d]epression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation." *Id.* at 566 (citing Haney & Lynch, *supra*, at 500–01, 521–31).

Further, the Sixth Circuit recently recognized that segregation more severely affects inmates with existing mental illness. *See J.H. v. Williamson Cnty.*, 951 F.3d 709 (6th Cir. 2020). "[S]olitary confinement 'can cause severe and traumatic psychological damage'" and an inmate's existing mental illness should be considered before placing him in or extending his isolation. *Id.* at 719 (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017)); *see also Wallace v. Baldwin*, 895 F.3d 481, 485 (7th Cir. 2018) (holding that the continued isolation of an inmate raised a "genuine concern that the negative psychological effects of his segregation will drive him to self-harm" because he had a mental illness and had already been isolated for 11 years). While considering the mental health of the inmate, a court should remain "mindful of the nature and duration" of the confinement in segregation. *J.H.*, 951 F.3d at 719.

Here, Plaintiff suggests that his long-term placement in segregation exacerbated his mental illness and caused him to be unstable. (ECF No. 10, PageID.64.) He alleges that as soon as he was released from segregation, he "immediately got into a fight because of the voices in his head urging him to do so." (*Id.*) His paranoia was also extreme because of the isolation forced upon him. (*Id.*) Plaintiff also alleges that he experienced "severe persistent suicidal ideology, along with the lack of culpability to understand and appreciate reality." (*Id.*, PageID.65.)

Plaintiff's allegations, however, do not sufficiently allege that each Defendant was personally involved in the decision to keep Plaintiff in segregation for an extended period of time.

A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). Plaintiff's amended complaint is devoid of allegations from which the Court could infer that any of the named Defendants were personally involved in classifying Plaintiff to long-term segregation. Indeed, with respect to Defendants Robare, Sullivan, and Maranka, Plaintiff alleges that they documented their opinions that subjecting Plaintiff to long-term segregation and loss of privileges would exacerbate his mental illness. Further, while Plaintiff alleges that Defendants Schafer and Eastham were involved in the decision to remove Plaintiff from the START Program waiting list, nothing in the amended complaint permits the Court to conclude that they were also involved in the decision to keep Plaintiff in segregation. Likewise, Plaintiff's allegations against Defendants Boudrea and Saad concern their diagnoses of Plaintiff and make no mention of them being involved in the segregation determination. The Court, therefore, will dismiss Plaintiff's Eighth Amendment claims against Defendants regarding his long-term placement in segregation.

### 2. Adequate Mental Health Treatment

The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle*, 429 U.S. at 103–04. The Eighth Amendment requires prison officials to provide medically necessary mental health treatment as well. *See id.* at 103; *Government of the Virgin Islands v. Martinez*, 239 F.3d 293, 301 (3d Cir. 2001); *Lay v. Norris*, No. 88-5757, 1989 WL 62498, at *4 (6th Cir. June 13, 1989); *Potter v. Davis*, No. 82-5783, 1985 WL 13129, at * 2 (6th Cir. Apr. 26, 1985). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Estelle*, 429 U.S. at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842).

However, not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical

13

> mistreatment under the Eighth Amendment. Medical malpractice does not become
> a constitutional violation merely because the victim is a prisoner. In order to state
> a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to
> evidence deliberate indifference to serious medical needs.

*Id.* at 105–06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (2014). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cnty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440–41 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be

14

intolerable to fundamental fairness." *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

### a.      Claims Regarding MMD Status

Plaintiff suggests that Defendant Boudrea violated his Eighth Amendment rights by changing Plaintiff's diagnosis on January 5, 2021. (ECF No. 10, PageID.64.) Plaintiff alleges that Defendant Boudrea initially diagnosed him with schizoaffective disorder, depressive type, which qualified as an MMD, but changed that diagnosis three months later. (*Id.*) Plaintiff also references that Defendant Saad diagnosed him with schizoaffective disorder, depressive type, on April 2, 2021, but appears to suggest that the diagnosis was not classified as an MMD. (*Id.*, PageID.65.)

Although Plaintiff faults Defendants Boudrea and Saad for apparently not keeping his MMD classification, the facts alleged by Plaintiff in no way rise to the level of deliberate indifference to Plaintiff's mental health needs. Plaintiff's claims boil down to disagreements with Defendants Boudrea and Saad about their approach to Plaintiff's mental health needs, which is insufficient to set forth Eighth Amendment claims. *See White v. Corr. Med. Servs.*, 94 F. App'x 262, 264 (6th Cir. 2004); *see also Mitchell*, 553 F. App'x at 605 ("[A] desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim." (citations omitted)). Nothing in Plaintiff's amended complaint suggests that Defendants Boudrea and Saad failed to provide any treatment at all for Plaintiff's mental health needs. The Court, therefore, will dismiss Plaintiff's Eighth Amendment claims premised upon his MMD status asserted against Defendants Boudrea and Saad.

### b.      Claims Regarding Medications

Plaintiff contends that Defendant Schafer violated his rights on April 22, 2021, by "discontinu[ing] and renew[ing] Plaintiff's medication." (ECF No. 10, PageID.65.) Plaintiff's allegation is simply too vague and conclusory for the Court to infer that Defendant Schafer was

15

deliberately indifferent to Plaintiff's mental health needs. Plaintiff's allegation is also contradictory. Alleging that Defendant Schafer discontinued his medications suggests that Plaintiff was no longer receiving them, but then Plaintiff states that she renewed them, suggesting that he continued to receive them. Either way, nothing set forth in the amended complaint suggests that Defendant Schafer was aware of any "substantial risk of serious harm" that may have arisen from discontinuing or renewing Plaintiff's medications. *Farmer*, 511 U.S. at 837. The Court, therefore, will dismiss this Eighth Amendment claim against Defendant Schafer.

Plaintiff also alleges that on July 7, 2022, Defendant Saad "paneled" him because he missed "a few doses of his medication." (ECF No. 10, PageID.65.) Plaintiff avers that "[m]ental health staff forced Plaintiff to take his medication." (*Id.*) As an initial matter, nothing in the amended complaint allows the Court to infer that any of the named Defendants were personally involved in any decisions to forcibly medicate Plaintiff. In any event, the Sixth Circuit has held that the Eighth Amendment is not violated by the involuntary administration of medication to a mentally ill patient:

> There is a recognized Eighth Amendment protection for prisoners against "deliberate indifference" to a serious medical need, but that indifference generally involves the *failure* to provide medical care. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976). In cases like Kramer's, where the medical personnel are treating him and have made a decision about the precise course of action he requests, claims are generally unsuccessful. *E.g.*, *Davis v. Agosto*, 89 F. App'x 523, 529 (6th Cir. 2004) (denying Eighth Amendment claim on summary judgment where defendant argued that the unwanted treatment of a head wound unnecessarily inflicted pain upon him).

> This is because *failing* to prevent medical harm only "rises to the level of a constitutional violation where both objective and subjective requirements are met." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Where the prisoner was in the care of a doctor (and the allegation is deliberate indifference based on care given and not intentional infliction of pain), our cases offer two verbal formulations to describe when a doctor's actions were subjectively callous so as to be constitutionally cruel and unusual punishment. First, if the prisoner received "grossly inadequate care," we will conclude a doctor acted with "subjective" deliberate indifference. *Perez v. Oakland Cnty.*, 466 F.3d 416, 424 (6th Cir. 2006).

Second, we have favorably cited the Eleventh Circuit's test: "whether a reasonable doctor . . . could have concluded his actions were lawful." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844 (6th Cir. 2002) (quoting *Waldrop v. Evans,* 871 F.2d 1030, 1034 (11th Cir. 1989)). While both approaches lack absolute analytic precision, it is clear that Kramer has not alleged facts that rise to the level of seriousness they convey. Kramer asserts only that he disagrees with the decision to keep him on lithium in the face of the risk of kidney failure and that outside doctors have not been permitted to review the decision made by the prison's medical professionals. This does demonstrate a possible disagreement over which health problem-the mental disorder or the risk of kidney problems-posed a more serious medical threat to Kramer. But it is far short of an allegation of "grossly inadequate care" or unlawful behavior. *Cf. Terrance*, 286 F.3d at 844–47 (holding that doctors and nurses could be found to have provided grossly inadequate care after they failed to supervise decedent or plan for risks associated with decedent's medical conditions despite their knowledge of immediate risk factors of sudden death). That is, even if he were to prove the disagreement at trial, he would not be entitled to relief because no alleged fact tends to show that the prison doctors provided "grossly inadequate care" or that their treatments were so medically unsound as to violate the law.

*Kramer v. Wilkinson*, 302 F. App'x 396, 400–01 (6th Cir. 2008).

As in *Kramer*, Plaintiff's amended complaint is devoid of facts alleging that he received "grossly inadequate" care. Plaintiff's amended complaint is devoid of facts suggesting that he suffered from side effects as a result of being forcibly medicated. Plaintiff's allegations fall far short of demonstrating that Defendant Saad or any of the other named Defendants acted with deliberate indifference by forcibly medicating Plaintiff. These Eighth Amendment claims will, therefore, be dismissed.

### c.      Claims Regarding Misconduct Sanction Assessment Forms

Plaintiff suggests that Defendants Robare, Sullivan, and Maranka violated his Eighth Amendment rights via their documentation of his mental health status on misconduct sanction assessment forms. Plaintiff alleges that Defendant Robare wrote that Plaintiff should not be subjected to prolonged LOP because that sanction "may cause a deterioration in mental status." (ECF No. 10, PageID.64.) Defendant Sullivan wrote that Plaintiff "is mentally ill and require[s]

special [management] while in segregation." (*Id.*) Finally, Defendant Maranka noted that "long term segregation may lead to [an] increase in mental health sym[p]toms." (*Id.*, PageID.65.)

Plaintiff's allegations simply fail to suggest that Defendants Robare, Sullivan, and Maranka were deliberately indifferent to his mental health needs and treatment. Conversely, Plaintiff's allegations suggest that these individuals specifically took his mental health diagnoses into account when recommending what sanctions would not work well in response to misconducts issued to Plaintiff. Defendants Robare, Sullivan, and Maranka cannot be held liable if other individuals did not follow their recommendations when sanctioning Plaintiff. The Court, therefore, will dismiss Plaintiff's Eighth Amendment claims against Defendants Robare, Sullivan, and Maranka.

### d.    Claims Regarding Removal from START Program Wait List

Finally, Plaintiff faults Defendants Schafer and Eastham for removing Plaintiff from the START Program wait list. (ECF No. 10, PageID.65.) Plaintiff alleges that Defendant Eastham removed him from the list on October 4, 2021, because the program "would not meet the criteria to understand Plaintiff." (*Id.*)

As an initial matter, Plaintiff's allegation is contradicted by the exhibits he attached to his initial complaint. One of those exhibits documents Plaintiff's treatment plan by Defendant Eastham. (ECF No. 1-2, PageID.19.) That document indicates that on October 4, 2021, Defendant Eastham noted that Plaintiff was "on the START list but may take time before he makes it to the program, however, QMHP shared that the providers in the program would not meet his criteria for understanding him." (*Id.*) Nothing in that document suggests that Defendant Eastham or Defendant Schafer actually removed Plaintiff from the START Program waiting list on that date.

In any event, Plaintiff's allegations are simply too conclusory for the Court to conclude that Defendants Schafer and Eastham were deliberately indifferent to Plaintiff's mental health needs to the extent that they did remove him from the waiting list. Plaintiff apparently believes

that placement in the START Program would have been an appropriate way to treat his mental health. As noted above, however, disagreements with Defendants Schafer and Eastham with respect to their approach to Plaintiff's mental health needs are insufficient to set forth Eighth Amendment claims. *See White*, 94 F. App'x at 264; *see also Mitchell*, 553 F. App'x at 605.

### C.    Personal Capacity Fourteenth Amendment Due Process Claims

As noted *supra*, Plaintiff contends that he was forcibly medicated. In *Vitek v. Jones*, 445 U.S. 480, 493 (1980), the United States Supreme Court held that a criminal conviction does not authorize the state to classify a prisoner as mentally ill, transfer him to a mental institution, and subject him to involuntary psychiatric treatment without affording him additional due process protections. The *Vitek* Court noted that the state had a strong interest in segregating and treating mentally ill patients, but that a prisoner's interest in not being arbitrarily classified as mentally ill, transferred to a mental institution, and subjected to involuntary treatment was also strong. The Court concluded that the state must apply "appropriate procedural safeguards against error." *Id.* at 495.

In a subsequent case, the Supreme Court addressed the due process implications of involuntarily medicating a prisoner separately from the classification and transfer aspects of *Vitek*. In that case, the prisoner was medicated without his consent pursuant to a written policy:

> Policy 600.30 was developed in partial response to this Court's decision in *Vitek v. Jones,* 445 U.S. 480 (1980). The Policy has several substantive and procedural components. First, if a psychiatrist determines that an inmate should be treated with antipsychotic drugs but the inmate does not consent, the inmate may be subjected to involuntary treatment with the drugs only if he (1) suffers from a "mental disorder" and (2) is "gravely disabled" or poses a "likelihood of serious harm" to himself, others, or their property. Only a psychiatrist may order or approve the medication. Second, an inmate who refuses to take the medication voluntarily is entitled to a hearing before a special committee consisting of a psychiatrist, a psychologist, and the Associate Superintendent of the Center, none of whom may be, at the time of the hearing, involved in the inmate's treatment or diagnosis. If the committee determines by a majority vote that the inmate suffers from a mental

19

disorder and is gravely disabled or dangerous, the inmate may be medicated against his will, provided the psychiatrist is in the majority.

Third, the inmate has certain procedural rights before, during, and after the hearing. He must be given at least 24 hours' notice of the Center's intent to convene an involuntary medication hearing, during which time he may not be medicated. In addition, he must receive notice of the tentative diagnosis, the factual basis for the diagnosis, and why the staff believes medication is necessary. At the hearing, the inmate has the right to attend; to present evidence, including witnesses; to cross-examine staff witnesses; and to the assistance of a lay adviser who has not been involved in his case and who understands the psychiatric issues involved. Minutes of the hearing must be kept, and a copy provided to the inmate. The inmate has the right to appeal the committee's decision to the Superintendent of the Center within 24 hours, and the Superintendent must decide the appeal within 24 hours after its receipt. *See* App. to Pet. for Cert. B-3. The inmate may seek judicial review of a committee decision in state court by means of a personal restraint petition or extraordinary writ. *See* Wash. Rules App. Proc. 16.3 to 16.17; App. to Pet. for Cert. B-8.

Fourth, after the initial hearing, involuntary medication can continue only with periodic review. When respondent first refused medication, a committee, again composed of a nontreating psychiatrist, a psychologist, and the Center's Associate Superintendent, was required to review an inmate's case after the first seven days of treatment. If the committee reapproved the treatment, the treating psychiatrist was required to review the case and prepare a report for the Department of Corrections medical director every 14 days while treatment continued.

*Washington v. Harper*, 494 U.S. 210, 215–16 (1990) (footnotes omitted). The Court concluded that Harper "possesse[d] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id*. at 221–22. Nonetheless, the Court also determined that the liberty interest "must be defined in the context of the inmate's confinement." *Id*. at 222. The Court held "that, given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id*. at 227. The Court concluded that the State of Washington's policy satisfied those requirements.

Within the MDOC, the procedure for the involuntary treatment of a prisoner with psychotropic medication is set forth in MDOC Policy Directive 04.06.183. This policy directive provides that a prisoner may be temporarily subjected to involuntary treatment with psychotropic medication where the following conditions are met: "a psychiatrist's certificate [is] executed which states [that] the prisoner is mentally ill"; the psychiatrist also concludes that the prisoner "is a present danger to himself or herself or to others"; "the prisoner refuses treatment"; and the psychiatrist orders "involuntary administration of psychotropic medication pending the convening of a Hearing Committee." *See* MDOC Policy Directive 04.06.183 ¶¶ Q–R (eff. Oct. 9, 1995).

The prisoner must be provided with a copy of the "Psychiatric Certificate, Psychiatric Report, QMHP Report, and a notice of hearing and rights to the prisoner and, if one has been appointed, to the guardian of the person" prior to the hearing committee being convened. *Id.* ¶ S. The prisoner must be assigned a Mental Health Advisor and must not be medicated for twenty-four hours prior to the hearing. *Id.* ¶ T. The hearing committee must consist of "a psychiatrist, a fully licensed psychologist, and another mental health professional whose licensure or registration requirements include a minimum of a baccalaureate degree from an accredited college or university, none of whom is, at the time of the hearing, involved in the prisoner's treatment or diagnosis." *Id.* ¶ C. The hearing committee must consider "the QMHP Report alleging that the prisoner is mentally ill, the Psychiatric Report, the Psychiatrist's Certificate, proof that a notice of hearing has been served, proof that the prisoner has not been medicated within 24 hours and any other admissible evidence presented at the hearing." *Id.* ¶ W. The prisoner has the right to attend the hearing, may bring along his or her guardian, and is entitled to the assistance of his or her mental health advisor. *Id.* ¶ X. The prisoner may present evidence, including witnesses, and may cross-examine witnesses. *Id.* The hearing committee must then "determine whether the prisoner is

mentally ill and, if so, whether the proposed mental health services are suitable to the prisoner's condition. A finding of mental illness must be confirmed by the psychiatrist on the Hearing Committee to be valid." *Id.* ¶ Y. The committee must prepare an official record of the hearing and must present to the prisoner a report of their findings and orders, along with an appeal form. *Id.* ¶¶ Z–AA. The initial period of treatment may not exceed ninety days. *Id.* ¶ AA. The prisoner may then appeal the hearing committee's decision to the Director of the Corrections Mental Health Program with the assistance of their Mental Health Advisor; the prisoner may then appeal that decision to the appropriate state circuit court. *Id.* ¶ DD. The policy also provides for renewal of the medication order. *Id.* ¶¶ EE–FF. The prisoner is also entitled to a copy of the corrections mental health program ("CMHP") guidebook which contains "rights information," and is to be offered an "opportunity to consult with staff from the Office of the Legislative Corrections Ombudsman." *Id.* ¶ GG.

Because none of the members of the hearing committee may be involved in the inmate's current treatment or diagnosis, the MDOC policy provides for an independent decisionmaker. The policy also provides that the inmate has a right to be present at the hearing and present evidence and can appeal the decision to the Director of the CMHP and the circuit court. Therefore, it is clear that the MDOC policy passes rational basis scrutiny and satisfies procedural due process. *Harper*, 494 U.S. at 233–35.

Plaintiff's allegation is largely conclusory, and he fails to allege facts indicating that he was denied a hearing, was not allowed to present at the hearing, and was not allowed to file an appeal. In *Harper*, the Supreme Court stated:

> Under Policy 600.30, the decisionmaker is asked to review a medical treatment decision made by a medical professional. That review requires two medical inquiries: first, whether the inmate suffers from a "mental disorder"; and second, whether, as a result of that disorder, he is dangerous to himself, others, or their

property. Under the Policy, the hearing committee reviews on a regular basis the staff's choice of both the type and dosage of drug to be administered, and can order appropriate changes. 110 Wash.2d, at 875, 759 P.2d, at 360. The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals. A State may conclude with good reason that a judicial hearing will not be as effective, as continuous, or as probing as administrative review using medical decisionmakers. We hold that due process requires no more.

*Id*. at 232–33. Here, Plaintiff fails to allege facts from which the Court could infer that he was denied the protections afforded by MDOC Policy Directive 04.06.183. Accordingly, Plaintiff's Fourteenth Amendment due process claims will be dismissed.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's amended complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.

Dated:   March 23, 2022                         /s/ Jane M. Beckering
                                                Jane M. Beckering
                                                United States District Judge